Commonwealth *v.* Goldman, Appellant.

524

Argued April 19, 1937.

Before Keller, P. J., Cunningham, Baldrige, Stadtfeld, Parker, James and Rhodes, JJ.

*J. A. Welsh,* with him *Louis Cohen,* for appellant.

*Daniel W. Kearney,* with him *Robert M. Fortney,* District Attorney, for appellee.

Opinion by Stadtfeld, J., July 15, 1937:

This is an appeal by defendant from the conviction and sentence on the charge of larceny of a diamond ring of prosecutrix, Mrs. Leo H. Breslin, on the 28th day of August, 1936, at her home in the Borough of Mt. Carmel, County of Northumberland.

Appellant is a rug salesman and at the time of the commission of the alleged offense, together with his brother, had established headquarters at the Davis Hotel in the City of Pottsville, Schuylkill County. From

this Hotel they went out each day to different towns for the purpose of disposing of their merchandise.

About 8:30 on the morning of August 28th, 1936, defendant, together with his brother, John Goldman, left Pottsville to go to Mt. Carmel, Pa. to canvass that town. They reached Mt. Carmel between 9:30 and 10:00 A. M.

Among other places, appellant went to the home of Mrs. Leo H. Breslin, at 313 N. Vine Street, Mt. Carmel. He reached there about 10:00 A. M.

Mrs. Breslin was interested in the purchase of a rug. Appellant brought in one of his rugs and laid it on the floor of the living room of the Breslin home for inspection. Mrs. Breslin was satisfied with the rug and a bargain was struck with the appellant.

The Breslin home faces west, is one half of a double dwelling house and has three rooms on the first floor, a living room or front room, dining room and then the kitchen. The front door of the house opens into the living room and between it and the dining room is an archway making the two practically one room. There is a wooden door between the kitchen and the dining room. In the dining room there is an open stairway leading to the second floor.

After Mrs. Breslin and appellant had agreed on the purchase of the rug, she went upstairs to the front room on the second floor to get her wallet to pay for her purchase. On direct examination she testified: "Q. How long were you upstairs? A. Oh—no more than two minutes at the longest and came down and paid the money and he went out of the house......" And on cross examination: "Q. Can you see in the front room, the living room from upstairs? A. If you stand on the stairs. Q. Do I understand that when you made this purchase you hurried upstairs to get the money. A. Yes, I did. Q. It was two minutes between the time you left the living room until you returned, is that all? A. About that. Q. No more. A. Positively. Q. Are

you sure about that? A. Well just figured the necessary time to go up the stairs and go down and count the $28.00. That is all...... Q. You knew where the wallet was and you went right up and got it, didn't you? A. Positively. Q. And only stopped long enough to open the door and get the wallet out. A. That is all. Q. And immediately turned around— A. And came down stairs...... Q. When you got to the head of the stairs you could see down stairs, couldn't you? A. Yes. Q. Where was the defendant standing when you got to the head of the stairs? A. Oh, he was standing about in the centre of the room. Q. Could you see him from the head of the stairs? A. You could see him. I don't remember having noticed him from the head of the stairs ......Q. But you saw where he was standing. A. Yes ......Q. Was he standing still when you came down stairs? A. I think so."

The Commonwealth contends that Mrs. Breslin placed her wedding, engagement and the alleged stolen ring on the second shelf of the bookcase part of the secretary which stood at an angle on the north side of the room with the back to that small portion of the partition wall which remained between the living room and the dining room near the foot of the open stairway.

In this living room is an ordinary sized window and glass front on the outside door. There were no windows on either side of these rooms. There were curtains and shades on the window and on the door. The shades on both window and door were drawn about half way on this day.

The only time Mrs. Breslin was out of the room was when she went upstairs to get her wallet. At this time the defendant was standing in the centre of the room and the child, Leo Breslin, Jr., was somewhere in the living room.

It is further contended by the Commonwealth that while Mrs. Breslin was upstairs the defendant asked

her son Leo Breslin, Jr. to get him a drink of water from the kitchen, and the child replied that he couldn't reach the glasses. That the boy then went to the kitchen from the living room to get the water and had returned to the living room before his mother had come down stairs.

The front bedroom upstairs is close to the top of the stairway, and the only time Mrs. Breslin was out of sight and hearing of her son was when she went from the top of the stairway into the bedroom, and returned to the top of the stairs, a very short distance. She does not testify hearing any conversation between the appellant and her son.

The only witness upon which the Commonwealth relied and upon which it depends to sustain this conviction is Leo Breslin, Jr., a minor child of the prosecutrix. The boy was four years and seven months old when the alleged crime was committed and had not reached his fifth birthday, when he testified to events which had occurred about three months prior thereto. Defendant objected to the child being sworn and allowed to testify on the ground of his tender age, and that he did not have sufficient conception of the nature of an oath.

The Court submitted the case to the jury solely upon the evidence of the child.

The defendant denied taking the ring. There was no evidence that he ever had the ring in his possession.

The jury found appellant guilty in the manner and form in which he was indicted.

Motion in arrest of judgment and for a new trial was made and overruled. The defendant was sentenced to pay the costs, a fine of $100 and to serve one year in Northumberland County prison. From this sentence defendant appealed.

The only assignments of error which it is necessary to discuss, are those which relate to permitting the minor

child referred to to be sworn and to testify on the part of the Commonwealth.

The court in banc, in an opinion by CUMMINGS, J., frankly states, that without the testimony of this witness a conviction could not have been had.

As stated in *Piepke v. Phila. & Reading Ry. Co.*, 242 Pa. 321 at 329, 89 A. 124: "......that where there is no precise or fixed rule as to the time within which infants are excluded from giving evidence 'their admission depends upon the sense and reason they entertain of the danger and impiety of falsehood which is to be collected from their answers to questions propounded to them by the Court......'

"The substantial test of competency of an infant witness is his intelligence and his comprehension of an obligation to tell the truth".

It is conceded that the trial judge has a wide discretion in passing on the competency of such witness. Appellant contends that there was an abuse of discretion in permitting Leo Breslin, Jr. to testify.

That the trial judge himself was in considerable doubt and hesitated in accepting the witness is evident from the preliminary examination of the latter conducted by him. We quote therefrom: "BY THE COURT: Q. Where do you live? A. 213 Vine Street. Q. What town? A. Mt. Carmel. Q. Do you go to Sunday School? A. Yes. Q. What Sunday School do you attend? A. Mt. Carmel. Q. What one? A. I forget which one. Q. Who is your Sunday School teacher? A. I don't know her name. Q. Is it a lady? A. Yes. Q. Do you know what you are expected to do when you testify as to telling the truth or telling a story? A. Yes. Q. What are you to tell now when they ask you questions? (The witness made no answer.) Q. Do you know anything about the truth? What must you do now when they ask you questions? A. Talk to the man. Q. Are you going to tell the truth, or are you going to tell stories? A. Yes. Q.

Do you know what happens when little boys do not tell the truth? A. Yes. Q. What happens if you don't tell the truth? Do you know what would happen if you do not tell the truth? A. No. Q. Do you think that if you told a story, it would be all right? A. Yes. THE COURT: I am afraid, Mr. Kearney, under the circumstances—Mr. KEARNEY: He knows what the difference is between the truth and a lie. By Mr. Kearney: "Do you know what it is to tell a lie? A. A sin. Q. If you are allowed to testify in this case, will you tell the truth? A. Yes. Q. Would you tell a lie, Leo? A. No. Q. Do you know the difference between telling a lie and telling the truth? A. I don't know the truth. The Court: The situation is this: We are on the borderline, according to the authorities. We are very much in danger here. I will have to sustain the objection ." . . . . . . "By The Court: Q. Do you know what an oath is when you are sworn to tell the truth? A. Yes. Q. You must do what? A. Hold your hand up. Q. Then, must you tell a lie? A. No. Q. What? A. You must tell the truth. Q. When you hold up your hand, you know that you must tell the truth, do you? A. Yes. The Court: We will let you be sworn, then. Mr. Welsh: If the Court please, I would like to examine the witness for a moment. The Court: I will permit you to ask the witness some questions if you like, but the authority which you present practically holds that the examination is largely confined to the Court, but I will let you ask some questions. By Mr. Welsh: Q. When were you five years old? When is your birthday? A. In September. Q. Were you four in September? A. No, I was not born in September. Q. When is your birthday? A. In September. Q. Were you four years old in September? A. Five. Q. To what church do you go, or don't you go to church at all? A. Saint Peters. Q. You don't go to school, do you? A. Yes.

Q. You don't know what it is to tell the truth, do you? A. No, I only know what a sin is. Q. You don't know what it is to tell the truth? A. No. By The Court: Q. Is a lie a sin? A. Yes. The Court: I will permit the witness to be sworn. Mr. Welsh: Will your Honor grant me an exception? The Court: Yes. (Exception noted for the defendant.) By The Court: Q. Will you tell the whole truth? A. About the man? Q. Yes. Will you tell the truth about it? A. Yes. (The witness was sworn.)"

Then followed his testimony which, because of its importance, we quote in full: "Direct Examination— By Mr. Kearney: Q. Leo, were you home on the morning that the rug man came to see your mother? Do you know the man if you saw him? A. Yes. Q. Where is he sitting? A. Over there (indicating the defendant). Q. Which man is he? The fat one or the thin one? Is he the man on the end? A. Yes. Q. Did you see him in your home? A. Yes. Q. Who was in your home at the time he was there? A. Me and my mother and that is all. Q. Did this man say anything to you? A. He said, 'Get me a drink of water.' I said, 'I can't reach no glasses.' I saw him put his hand through the glass and put the ring in his pocket. (The answer was repeated by the stenographer as above recorded.) By Mr. Kearney: Q. Did you go out to the kitchen? A. Yes. Q. Where were you standing when you saw the man put his hand— A. Out in the kitchen. Q. Was the door of the kitchen open? A. Yes. Q. Was there anything between the kitchen and the room where the man was? A. No. Q. Where did you see the man put his hand when you were standing in the kitchen? A. In the door and put his hand into his pocket. Q. You saw him put his hand into the door of the secretary? A. Yes. Q. Where was your mother? A. Upstairs. Q. Did your mother come down? A. Yes. Q.

Did the man leave your home? A. Yes. Q. You say that you went out to the kitchen? A. Yes. Q. Was your mother upstairs when you went out? A. Yes. Q. To get him a drink? A. Yes, I said, 'I can't reach no glasses.' Q. Where is this secretary, or desk, in your home? A. It is in the front room. Q. Could you see that from the kitchen, where you were standing? A. Yes. Q. You say that the kitchen door was open? A. Yes. Cross Examination: By Mr. Welsh: Q. Did you talk to your mother about this? A. No, I told the chief of police Morgan. Q. You never talked to your mother? A. I did not talk to my mother. Q. You did not talk to your mother about it at all? A. No. Q. You never told your mother anything about it? A. No, a farmer came in. Q. But you never told your mother about it at all? A. No— Q. Did your mother tell you what to say? A. A farmer came in, and some money was in there, and she went to this bookcase, and the ring was gone. Q. Did your mother talk to you about this case at all? Did she tell you what to say? A. No. Q. Do you understand what I mean? (The witness nodded his head.) Q. Did your mother tell you what to say? A. No. Q. You are sure about that? A. Yes. Q. Did your father talk to you about it? A. My mother went over to the brewery and told my daddy. Q. You did not go with her, did you? A. No, I stayed home. Q. Did you talk to your father about it? A. Yes. Q. You told your father? A. Yes. Q. When did you tell him? A. When he came home. Q. But you are sure that you never talked to your mother? A. No. Q. In what part of the kitchen is the water? A. It is in the back. Q. Were you back where the water is? A. Yes. Q. That is in the back part of the kitchen, isn't it? A. Yes. Q. How soon after your mother went upstairs did you go out? A. He asked me for a drink of water first. Q. How soon after your mother went upstairs did he ask you for the drink of

water? A. Yes. Q. How soon? A. When she went upstairs he asked me. He asked twice. Q. Were you in the kitchen when your mother came downstairs? A. No, I was in the front room. Q. With your mother? A. Yes. Q. You were with your mother when the man went out? A. Yes. Q. Did you see him put anything in his pocket? A. Yes. Q. What was it? A. When I was in the kitchen I saw him put it in his pocket. Q. You don't know what he put in his pocket? A. Yes. Q. What was it? A. The ring. Q. Did you see the ring? A. No, I saw him put his hand into the desk. Q. You saw him put his hand on the desk and put it in his pocket? A. Yes. Q. You did not see him have anything, did you? A. No. Q. Then you don't know what he put in his pocket? A. I don't know what he put in his pocket that day".

A remarkable circumstance is the fact that the child, although in the living room when appellant left, yet said nothing to his mother about appellant having gone to the secretary.

Both on account of the uncertainty as to the competency of the child to testify, and the character of his testimony, we do not believe it would be safe to let a conviction stand under such circumstances.

The assignments of error referred to are sustained, the judgment reversed, and new trial granted.